J-S03016-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: S.A.P., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: C.M., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 2481 EDA 2017 |

Appeal from the Order Entered May 11, 2017
In the Court of Common Pleas of Philadelphia County
Family Court at No(s):  CP-51-AP-0001244-2016
CP-51-DP-0001656-2014

| | | |
|---|---|---|
| IN THE INTEREST OF: S.A.A.S., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: C.M., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 2482 EDA 2017 |

Appeal from the Order Entered May 11, 2017
In the Court of Common Pleas of Philadelphia County
Family Court at No(s):  CP-51-AP-0001243-2016
CP-51-DP-0001657-2014

BEFORE:   BENDER, P.J.E., PANELLA, J., and STEVENS*, P.J.E.

MEMORANDUM BY PANELLA, J.                    **FILED APRIL 04, 2018**

_____

* Former Justice specially assigned to the Superior Court.

C.M. ("Mother"), appeals *nunc pro tunc*[1] from the orders entered May 11, 2017, in the Court of Common Pleas of Philadelphia County, granting the petitions filed by the Philadelphia Department of Human Services ("DHS") seeking to involuntarily terminate Mother's parental rights to her two minor children, a female, S.A.A.S., (born in April 2014), and a male, S.A.P., (born in January 2011) (collectively, the "Children"), pursuant to § 2511 of the Adoption Act, and to change the Children's permanency goal to adoption, pursuant to § 6351 of the Juvenile Act.[2, 3] Mother's counsel, Michael J. Graves, Jr., Esquire, ("Mother's Counsel"), has filed with this Court a motion for leave to withdraw as counsel and a brief pursuant to **Anders v. California**, 386 U.S. 738, 744 (1967). We affirm and grant Mother's Counsel leave to withdraw.

---

[1] On July 19, 2017, Mother's counsel filed a motion for reinstatement of appeal *nunc pro tunc*. The trial court granted the petition on July 25, 2017 **See** Trial Court Opinion, 9/11/17, at 1 n.1.

[2] On May 11, 2017, the trial court also involuntarily terminated the parental rights of both S.A.A.S.'s father, R.A.S., and S.A.P.'s father, M.P., to their respective child. Neither father filed an appeal, nor is either a party in the appeals before the Court.

[3] Lisa M. Visco, Esquire, the court-appointed guardian *ad litem* ("GAL") representing the Children, was present at the termination/goal change hearing on May 11, 2017. **See In re Adoption of L.B.M.**, 161 A.3d 172 (2017) (Pa. 2017). At the hearing on the termination petition, Attorney Visco actively conducted questioning of the witnesses. We can discern no conflict in the legal interests and the best interests of the Children in this matter. **See In re D.L.B.**, 166 A.3d 322 (Pa. Super. 2017).

The trial court set forth the factual background and procedural history of this appeal as follows.

R.A.S. is the Father of S.A.A.S. (Exhibit "A" Statement of Facts, attached to DHS Petition for Involuntary Termination of Parental Rights, filed 12/19/2016, ¶"b").

M.P. is the Father of S.A.P. (Exhibit "A" Statement of Facts, attached to DHS Petition for Involuntary Termination of Parental Rights, filed 12/19/2016, ¶"c").

On April 26, 2014, the Department of Human Services (DHS), received a General Protective Services (GPS) Report alleging that C.A.M., Mother, hand [sic] given birth to S.A.A.S. on 4/[ ]/2014 at the Hospital of the University of Pennsylvania (HUP); that the Child was 38 weeks and 5 days gestation, and weighed six pounds and seven ounces at the time of her birth; that the Child tested positive for marijuana at the time of birth; that Mother previously tested positive for marijuana during the birth of the [c]hild's sibling, S.A.P.; that Mother refused to provide a urine drug screen to hospital staff; that Mother admitted to recreational marijuana use; and that Mother stated that she had items to care for the infant in her home. The Report also alleged that Mother had a total of five [c]hildren and they all resided with Mother; that an unknown [m]aternal [a]unt was caring for the other four [c]hildren while Mother was hospitalized; and that S.A.A.S.'s Father, R.S., was not involved in her care. This Report was substantiated. (Exhibit "A" Statement of Facts, attached to DHS Petition for Involuntary Termination of Parental Rights, filed 12/19/2016, ¶"d").

On April 27, 2014, DHS met with Mother at HUP, prior to her discharge, to discuss the allegations of the 4/26/2014 GPS Report; DHS learned that S.A.A.S. and Mother were both medically cleared for discharge. Mother stated that she did not have a crib or bassinette for the [c]hild but had many other items to care for the infant; that she no longer had legal custody of another [c]hild due to his adoption; that two other [c]hildren were residing with relatives; and that S.A.P. was the only [c]hild residing in her care and was in the care of his [m]aternal [a]unt while Mother was hospitalized. (Exhibit "A" Statement of Facts, attached to DHS Petition for Involuntary Termination of Parental Rights, filed 12/19/2016, ¶"e").

On April 28, 2014, DHS learned that, after being discharged from HUP, Mother and infant Child [S.A.A.S.] began residing with Mother's [m]aternal [a]unt and [u]ncle, C.H. and S.H.; and that the family had obtained all of the necessary items for the infant. Mother was in agreement with receiving Family Empowerment Services (FES). (Exhibit "A" Statement of Facts, attached to DHS Petition for Involuntary Termination of Parental Rights, filed 12/19/2016, ¶"f").

On or about May 7, 2014, DHS referred the family for FES [Foundation for Educational Services] to address the family's needs. Mother was referred to receive assistance with drug treatment, housing, employment, and to attend parenting classes. (Exhibit "A" Statement of Facts, attached to DHS Petition for Involuntary Termination of Parental Rights, filed 12/19/2016, ¶"g").

On about May 15, 2014, DHS learned that the FES provider was unable to meet with the family; that Mother stated that she had a scheduling conflict that day; that Mother had to attend a medical appointment; that she was willing to reschedule with the FES provider, and that a new appointment was made for June 8, 2014. (Exhibit "A" Statement of Facts, attached to DHS Petition for Involuntary Termination of Parental Rights, filed 12/19/2016, ¶"h").

On May 22, 2014, Father, R.S., was arrested and charged with possession of a firearm prohibited, firearms not to be carried without a license, and carrying firearms publicly in Philadelphia. Father was incarcerated at CFCF as a result of the arrest. (Exhibit "A" Statement of Facts, attached to DHS Petition for Involuntary Termination of Parental Rights, filed 12/19/2016, ¶"i").

On June 8, 2014, DHS received a GPS Report which alleged that the Children were involved in an automobile accident with Mother; that Mother drove into the sides of several vehicles while under the influence of an unknown substance; that neither [c]hild was properly secured inside of the vehicle at the time of the accident but Mother strapped S.A.A.S. to herself using a baby carrier harness; that Mother was arrested as a result of the accident; that the Children were brought to Children's Hospital of Philadelphia (CHOP) for an examination following the automobile accident; and that the Children were without a caregiver. The

Report also alleged that Mother had an extensive history of drug use; that Mother's ability to parent appropriately was severely diminished due to her chronic drug use; that Mother has three other [c]hildren that are no longer in her care; and that S.A.A.S. and S.A.P., both tested positive for marijuana at the time of their births. This Report will be substantiated. (Exhibit "A" Statement of Facts, attached to DHS Petition for Involuntary Termination of Parental Rights, filed 12/19/2016, ¶"j").

On June 8, 2014, Mother was arrested, charged and on July 14, 2014, pled guilty to: 75 [Pa.C.S.A.] § 3802–A1-DUI: Gen Imp/Inc of Driving Safety; 75 [Pa.C.S.A.] § 3802-C–DUI: Highest Rate of Alc (BAC .16+); 75 [Pa.C.S.A.] §3802-D2-DUI: Controlled Substance -Impaired Ability; 75 [Pa.C.S.A. § 3802]-D3-DUI: Controlled Substance-Combination Alcohol/Drugs; and 75 [Pa.C.S.A.] § 3743-A-DUI[:]-Accident Involv Damage Attended Vehicle/Prop (2 Counts). Sentence: 10/02/2014 - Confinement 72 hours-6 months. (DHS EXHIBIT 44 -Court Summary, C.A.M., [born in May 1986], p.2-3).

On June 8, 2014, DHS learned that Mother was arrested after her automobile accident; that the Children were in the vehicle with Mother; that neither [c]hild was appropriately secured at the time of the accident; that the Children were taken to CHOP to be evaluated; that Mother had contacted S.A.A.S.'s [p]aternal [g]randmother, L.S., ["Paternal Grandmother"] to care for the Children; and that L.S. picked the Children up after their evaluations at CHOP. (Exhibit "A" Statement of Facts, attached to DHS Petition for Involuntary Termination of Parental Rights, filed 12/19/2016, ¶"l").

On June 8, 2014, DHS visited Paternal Grandmother, L.S.'s[,] home to conduct a home evaluation. DHS observed that the home was in need of numerous repairs; that all utilities were operable; that the Children had appropriate sleeping arrangements; and that the Children were safe with their needs being met. L.S. stated she would be moving to a new residence due to the level of repairs needed in her current home; that L.S. was willing to care for both [c]hildren until alternate arrangements could be made; and that L.S. had also recently been incarcerated. DHS was able to implement a short term Safety Plan and L.S. agreed to the terms of the Safety Plan. (Exhibit "A" Statement of Facts, attached to DHS Petition for Involuntary Termination of Parental Rights, filed 12/19/2016, ¶"m").

On June 10, 2014 and June 13, 2014, DHS attempted to locate other family resources that could care for the Children on a long[-]term basis. (Exhibit "A" Statement of Facts, attached to DHS Petition for Involuntary Termination of Parental Rights, filed 12/19/2016, ¶"n").

In June 2014, DHS learned that Paternal Grandmother, L.S., had made plans to move to the State of Georgia; and that no other family resources were available to care for the Children. (Exhibit "A" Statement of Facts, attached to DHS Petition for Involuntary Termination of Parental Rights, filed 12/19/2016, ¶"o").

On July 11, 2014, DHS learned that L.S. would no longer be able to care for the Children, and obtained an Order of Protective Custody (OPC) for both [c]hildren. They were placed in a foster home through Lutheran Children and Family Services (LCFS). (Exhibit "A" Statement of Facts, attached to DHS Petition for Involuntary Termination of Parental Rights, filed 12/19/2016, ¶"p, q").

A Shelter Care Hearing was held on July 14, 2014 before the Honorable Allan L. Tereshko. The Court Order lifted the OPC and transferred legal custody of the Children to DHS. Placement of the Children is in Foster Care. DHS is exploring Paternal Grandmother as possible placement resource. Mother is incarcerated at The Cannery. Safety as of 7/11/2014. (Shelter Care Orders, 7/14/2014).

An Adjudicatory Hearing was held for S.A.A.S., on July 23, 2014, before Honorable Allan L. Tereshko. The [c]ourt found legal custody of the Child to remain with DHS and placement in Foster Care. Mother is referred to CEU [("Clinical Evaluation Unit")] for a forthwith drug screen and assessment. FSP meeting to be held within next 30 days. Child is adjudicated Dependent. Father's address is [   ], Philadelphia, PA. (Order of Adjudication and Disposition - Child Dependent, 7/23/2014).

On July 23, 2014, S.A.P.'s case was continued. Mother to have supervised visits at the Agency, twice weekly. Child referred to BHS for consultation and evaluation.

Mother referred to CEU forthwith for drug screen and assessment. FSP meeting to be held within next 30 days.

Temporary Commitment Stands. (Continuance Order, 7/23/2014).

On August 20, 2014, both cases were continued at the request of Mother's attorney. Status Quo. (Continuance Orders, 8/20/2014).

An Adjudicatory Hearing was held for S.A.P., on September 15, 2014 before Honorable Allan L. Tereshko. The [c]ourt found temporary legal custody of the Child to remain with DHS and placement to remain in Foster Care through LCFS. Reasonable efforts were made prior to the placement for the two siblings to be placed together. Mother may have supervised visits twice a week at the Agency. Mother is referred to CEU for assessment, forthwith drug screen and monitoring. FSP meeting to be held within next 30 days. Child may be moved prior to the next court date by agreement of the parties. Agency, Social Worker, to refer the Child for Child Link/Early Intervention Services, and provide medical insurance card for the Child. Child is re-referred to BHS for consultations or evaluation. DHS to conduct home evaluation and clearances on the Paternal Grandmother's home. Child is adjudicated dependent. (Order of Adjudication and Disposition - Child Dependent, 9/15/2014).

A Permanency Review Hearing was held for S.A.A.S. on September 15, 2014, before the Honorable Allan L. Tereshko. Legal custody of the [c]hild remains with DHS, and placement remains in Foster Care through LCFS. Child is not receiving any special services and is doing well. DHS is to conduct home evaluation and clearances on the sibling's [p]aternal [g]randmother's home. Mother to continue supervised visits twice weekly at the Agency. Mother is referred to CEU for assessment, forthwith drug screen and monitoring. Child may be moved prior to the next court date by agreement of the parties. Agency, Social Worker, to refer the [c]hild for Child Link/Early Intervention Services, and provide medical insurance card for the Child[.] (Permanency Review Order, 9/15/2014).

Permanency Review Hearings were held for the Children on November 18, 2014, before the Juvenile Court Hearing Officer, William T. Rice. An Order was entered that legal custody to remain with DHS, and placement to continue in Foster Care with Lutheran. DHS to explore Kinship with Paternal Grandmother. Mother to comply with parenting classes, supervised visits with Mother to

continue. All appropriate services for the Children shall continue. Mother referred to BHS for consultation and evaluation. Lutheran [LCFS] to continue to assess S.A.P.'s behavioral health needs. (Permanency Review Orders, 11/18/2014).

On January 12, 2015, DHS held a Single Case Plan (SCP) meeting. The parental objectives established for Mother were to participate in mental health evaluation; comply with all, cooperate with all treatment recommendations including therapy and/or medication as prescribed; sign authorizations to allow DHS to obtain copies of the evaluations and progress reports, locate and occupy housing for the family with suitable space, heat, and safe living conditions; provide DHS with a copy of the lease and utility bills; maintain a parent/child relationship through participation in placement activities and regular visits with the Children; attend all visits and maintain regular contact with the Children; meet regularly with DHS Social Worker and follow through with the ISP; meet the Children's basic needs including food and clothing; provide Children regular nutritious meals, learn and understand age appropriate behavior and expectations for the Children; enroll in parenting education; and receive appropriate medical evaluations and comply with all recommended treatments. Mother was not in attendance at the FSP meeting and did not participate. Parental goals for both Fathers were not established. (Exhibit "A" Statement of Facts, attached to DHS Petition for Involuntary Termination of Parental Rights, filed 12/19/2016, ¶ "x").

On February 12, 2015, both cases were continued. Cases remain Status Quo. Continuance Orders, 2/12/2015).

On March 18, 2015, both cases were continued. Cases remain Status Quo. (Continuance Orders, 3/18/2015).

Permanency Review Hearings were held for the Children on May 29, 2015, before the Juvenile Court Hearing Officer, William T. Rice. It was ordered that legal custody to remain with DHS, and placement to continue in Foster Care with Lutheran [LCFS]. Mother referred to CEU for forthwith drug screen, monitoring, and to continue drug and alcohol treatment through GPASS [(Greater Philadelphia Social Service Center)]. Mother to continue twice[-]weekly supervised visits with Children at the Agency, which may be modified by agreement of the parties. Mother to complete 3 random drug screens prior to next court date. All appropriate

services for the Children shall continue. Children may be moved to Kinship home prior to next court date after appropriate documentation is received and home evaluation is completed. Social Worker to appear. (Permanency Review Orders, 5/29/2015).

On June 30, 2015, DHS and CUA held a Single Case Plan (SCP) meeting. The parental objectives for Mother were to comply with drug and alcohol treatment and random screens, complete parenting programs at LCFS, and comply with the [c]ourt[-]ordered BHS evaluation. Mother was in attendance at the SCP meeting (Exhibit "A" Statement of Facts, attached to DHS Petition for Involuntary Termination of Parental Rights, filed 12/19/2016, ¶"z").

A continuance was granted on August 26, 2015, for case to be heard by a Judge. (Continuance Orders, 8/26/2015).

Permanency Review Hearings were held for the Children on October 14, 2015, before the Honorable Allan L. Tereshko. The [c]ourt ordered legal custody to remain with DHS, and placement to continue in Foster Care through Lutheran [LCFS]. Remain as committed. CUA [(Community Umbrella Agency)] to provide affidavit of safety to the court within 7 days. Assigned Social Worker from CUA to appear at next court listing. (Permanency Review Orders, 10/14/2015).

Permanency Review Hearings were held for the Children on November 25, 2015, before the Honorable Allan L. Tereshko. The [c]ourt ordered legal custody to remain with DHS, and placement to continue in Foster Care through Kinship. Request for a continuance by Mother's attorney was granted. (Permanency Review Orders, 4/12/2016).

Permanency Review Hearings were held for the Children on May 4, 2016, before the Honorable Allan L. Tereshko. The [c]ourt ordered legal custody to remain with DHS, and placement to continue in Foster Care through Kinship with Lutheran. Children to continue services through CCTC [(Children's Crisis Treatment Center)]. Mother re-referred to CEU for monitoring, and 1 random drug screen prior to next court date. Mother to provide documentation regarding drug treatment to CUA forthwith, and comply with parenting classes and CEU recommendations. CEU Report for Mother incorporated into the record. Mother to begin

unsupervised community day visits forthwith, which may be further modified to overnight before next court date by agreement of the parties. CUA to follow up with Children's medical insurance forthwith.  CUA to make outreach to S.A.A.S.'s Father and arrange supervised visits with Father at the Agency as arranged by the Agency. (Permanency Review Orders, 11/25/2015).

Permanency Review Hearings were held for the Children on February 24, 2016, before the Honorable Allan L. Tereshko. The [c]ourt ordered legal custody to remain with DHS, and placement to continue in Foster Care (Kinship) through LCFS. Mother to continue to be offered liberal unsupervised visits. S.A.A.S.'s Father, R.S., continues to be offered supervised visits at Grandmother's home and 1 supervised visit, once per month at the Agency.  CUA to assist with transportation to visits. Children are doing well, and medically up-to-date. S.A.P. attends Kindergarten and is receiving therapy through CCTC.  TSS services through Wordsworth being explored. Children's dental issues are being addressed. Mother is currently residing in a shelter.  CEU Report on Mother incorporated into the record. CUA to follow up with CEU. Mother referred to CEU forthwith for drug screen and monitoring. (Permanency Review Orders, 2/24/2016).

A continuance was granted on May 26, 2016 for case to be heard before a Judge. (Continuance Orders, 5/26/2016).

Permanency Review Hearings were held for the Children on August 24, 2016, before the Honorable Richard J. Gordon.  The [c]ourt ordered legal custody to remain with DHS, and placement to continue in Foster Care through Bethanna.  Mother's unsupervised day visits in the community decreased to supervised at the Agency as arranged. Children are doing well. S.A.A.S. receives Early Intervention Services - Behavioral Therapy. S.A.P. received Trauma Focused Therapy through CCTC, and receives Wrap-Around Services through Wordsworth.  Mother referred back to CEU for assessment, … full drug and alcohol screen, dual diagnosis and 3 random drug screens prior to next court date. Mother to comply with all SCP objectives and recommendations. Children to remain as committed. (Permanency Review Orders, 8/24/2016).

On January 4, 2017, both cases were continued by agreement of the parties.  Assigned Social Worker is unavailable for today's hearing. (Status Review Orders, 1/04/2017).

Trial Court Opinion, 9/11/17, at 2-12 (emphasis omitted).

On December 19, 2016, DHS filed petitions to involuntarily terminate Mother's parental rights to the Children and to change the permanency goal for the Children to adoption. On May 11, 2017, the trial court held a hearing on the termination and goal change petitions, at which Mother was present and represented by counsel.

DHS first presented the testimony of Medina Abney, the Wordsworth CUA Case Manager. DHS then presented the testimony of Paternal Grandmother. Finally, Mother testified on her own behalf. The trial court found the following facts from the testimony.

> [Ms. Abney] testified both Children are placed with S.A.A.S.'s [p]aternal [g]randmother, R.S. [sic] [L.S.], and she conducted a safety check on the Children on May 3, 2017. (NT. 5/11/2017, p.8 at 1-25).

> [Ms. Abney] testified the Children came into care on July 11, 2014, when an O[r]der of Protective Custody was obtained because the Children were in the car with Mother when she was driving under the influence and was in an accident. Both Children were taken to CHOP, and Mother was arrested. Mother was later convicted of endangering the welfare of her [c]hildren. (N.T. 5/11/2017, p.9 at 17-25; p.10 at 1-4).

> Ms. Abney stated Paternal Grandmother began caring for the two [c]hildren approximately two years before, and is the pre-adoptive source. She testified she has observed the interaction between the Children and the [g]randmother, and she meets all of the Children's needs. The Children have a caring, loving relationship with the [g]randmother. (N.T. 5/11/2017, p.11 at 20-25; p.12 at 1-20).

> Further, Ms. Abney testified the case plan objectives for Mother were for her to comply with drug and alcohol treatment,

to complete parenting classes and to comply with BHS assessments and screening. She made outreach to Mother when she received the case and met with her on March 15, 2017, outlining the case objectives. Mother provided her with information for [GPASS] to verify that Mother had completed drug and alcohol treatment. [GPASS] reported in a letter dated July 6, 2015, that Mother was unsuccessfully discharged from their program. Mother also did not comply with visiting the CEU unit as ordered by the [c]ourt. However, Mother did complete the parenting classes and received a certificate of completion in April 2016. (N.T. 5/11/2017, p.15 at 23-25; p.16 at 1-25; p.17 at 1-25; p.18 at 1-25; p.19 at 1-7).

Regarding supervised visitation at the Agency, Mother did not comply and stated that it was too far to travel to visit her Children and she wanted community visits. Mother has not visited the Children since Ms. Abney took over the case. Ms. Abney opined it would be in the best interest of the Children if Mother's parental rights were terminated and the Children be adopted. [Paternal] Grandmother has a great bond and relationship with the Children and believes they would not suffer irreparable harm if Mother's parental rights were terminated. Mother does not visit the Children, does not ask about medical appointments and only called her seeking community visits. (N.T. 5/11/2017, p. 19 at 8-25; p.20 at 1-25; p.21 at 1-25; p.22 at 1-9).

Under cross-examination by Ms. Banister, the Child Advocate, Ms. Abney stated Mother did complete three random drug screens, one of which was positive, and Mother refused a drug screen on another occasion. (N.T. 5/11/2017, p.23 at 4-25).

Trial Court Opinion, 9/11/17, at 13-14.

Next, the trial court found the following from the testimony of

Paternal Grandmother.

Paternal Grandmother, L.S., was the next to testify. She stated she is the paternal grandmother of S.A.A.S., however, she has had both Children in her care since approximately May 2014. She stated Mother was consistent with visits with the Children when she was having community visits, however, has not seen them recently. During Christmas, Mother would leave a voice message for the Children and maybe left another message once

before. Mother did provide birthday gifts for the Children. S.A.P. would initially ask for his Mother, however, both Children do not ask for her and she has faded away in their memory. (N.T. 5/11/2017, p.28 at 8-25; p.29 at 1-23).

On cross-examination by Ms. Banister, the Child Advocate, [Paternal] Grandmother noted that there is still a bond with Mother, through telephone conversations with the Children during holidays and on their birthdays. When questioned by Ms. Houston, Mother's attorney, Grandmother noted that when Mother was invited to medical, dental or mental health appointments[,] she would attend. (N.T. 5/11/2017, p.30 at 1-25; p.31 at 1-7, 11-25; p.32 at 1-11).

*Id*., at 14-15.

The trial court found the following from Mother's testimony.

Mother was next to testify. She stated her objectives were to get a mental health evaluation, obtain housing, and go to drug and alcohol treatment. She noted she completed her BHS [Behavioral Health Services] evaluation and is prescribed medications. She attends mental health treatment through Penn, and that she provided that information to CUA. Mother further stated she completed a rehabilitation program through Friends Rehabilitation. Mother noted she was homeless and in a shelter for 14 months, and has now obtained housing through Friends Rehabilitation. (N.T. 5/11/2017, p.33 at 6-25; p.34 at 1-24; p.35 at 1-8).

Mother stated the CUA workers could never establish visits for her on Saturdays or Sundays because they did not have anyone to supervise the visits and weekdays were not acceptable because the Children were in school. (N.T. 5/11/2017, p.35 at 9-24).

Mother claims she is bonded with the Children and sees them at times when they are with their Grandmother by passing them on the street or going to the store together. Whenever the [paternal grandmother] sees her, she stops the car and allows the Children to say hello to her. (N.T. 5/11/2017, p.36 at 1-25).

*Id*., at 15.

After the conclusion of the termination hearing, the trial court found DHS sustained its burden of proving by clear and convincing evidence that Mother's parental rights to the Children should be terminated, and it entered the orders at issue. Mother filed a notice of appeal, *nunc pro* tunc, along with a concise statement of errors complained of on appeal. This Court, acting, *sua sponte*, consolidated the appeals.

Mother's counsel filed a motion to withdraw as counsel, and an **Anders** brief on behalf of Mother. In her **Anders** brief on appeal, Mother's Counsel raises the following issues on behalf of Mother.

> In accordance with **Anders v. California**, is there anything in the record that might arguably support the appeal that upon independent review of the record the court should conclude that the appea[l] is not wholly frivolous?

> Whether there was a legal basis for terminating Mother's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(1), (a)(2), (a)(5), (a)(8) and (b) to change goal from reunification to adoption[?].

**Anders** Brief, at 6. "When considering an **Anders** brief, this Court may not review the merits of the underlying issues until we address counsel's request to withdraw." **In re S.M.B.**, 856 A.2d 1235, 1237 (Pa. Super. 2004).

Pursuant to **Anders**, when counsel believes an appeal is frivolous and wishes to withdraw representation, he or she must do the following:

> (1) petition the court for leave to withdraw stating that after making a conscientious examination of the record . . ., counsel has determined the appeal would be frivolous;

> (2) file a brief referring to anything that might arguably support the appeal. . .; and

- 14 -

(3) furnish a copy of the brief to defendant and advise him of his right to retain new counsel, proceed *pro se*, or raise any additional points he deems worthy of the court's attention.

*Id*. (citation omitted).

In ***Commonwealth v. Santiago***, 978 A.2d 349 (Pa. 2009), our Supreme Court addressed the second requirement of ***Anders***, *i.e.*, the contents of an ***Anders*** brief, and required that the brief:

(1)  provide a summary of the procedural history and facts, with citations to the record;

(2)  refer to anything in the record that counsel believes arguably supports the appeal;

(3)  set forth counsel's conclusion that the appeal is frivolous; and

(4)  state counsel's reasons for concluding that the appeal is frivolous.  Counsel should articulate the relevant facts of record, controlling case law, and/or statutes on point that have led to the conclusion that the appeal is frivolous.

978 A.2d at 361.

With respect to the third requirement of ***Anders***, that counsel inform the defendant of his or her rights in light of counsel's withdrawal, this Court has held that counsel must "attach to their petition to withdraw a copy of the letter sent to their client advising him or her of their rights." ***Commonwealth v. Millisock***, 873 A.2d 748, 752 (Pa. Super. 2005).

Mother's Counsel has complied with each of the requirements of ***Anders***. Accordingly, we will proceed with our own independent review. ***See In re S.M.B.***, 856 A.2d at 1237 ("After an appellate court receives an ***Anders***

- 15 -

brief and is satisfied that counsel has complied with the aforementioned requirements, the Court then must undertake an independent examination of the record to determine whether the appeal is wholly frivolous.").

In the *Anders* brief, Mother's Counsel contends the trial court abused its discretion or erred as a matter of law in concluding DHS presented clear and convincing evidence that was sufficient to support the involuntary termination of her parental rights under § 2511(a)(1), (2), (5), (8), and (b).

> The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks omitted).

Termination of parental rights is governed by § 2511 of the Adoption Act, which requires a bifurcated analysis.

> Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis

concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

***In re L.M.***, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted).

This Court may affirm the trial court's decision regarding the termination of parental rights with regard to any *one* subsection of § 2511(a). ***See In re B.L.W.***, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*). We need only address subsection (a)(2).

Section 2511(a)(2) provides, in relevant part, as follows:

**§ 2511. Grounds for involuntary termination**

**(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

\* \* \*

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

23 Pa.C.S.A. § 2511(a)(2).

Our Supreme Court set forth our inquiry under subsection (a)(2) as follows.

> [Section] 2511(a)(2) provides statutory grounds for termination of parental rights where it is demonstrated by clear and convincing evidence that "[t]he repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions

and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent." . . .

This Court has addressed incapacity sufficient for termination under § 2511(a)(2):

> A decision to terminate parental rights, never to be made lightly or without a sense of compassion for the parent, can seldom be more difficult than when termination is based upon parental incapacity. The legislature, however, in enacting the 1970 Adoption Act, concluded that a parent who is incapable of performing parental duties is just as parentally unfit as one who refuses to perform the duties.

***In re Adoption of S.P.***, 47 A.3d 817, 827 (Pa. 2012) (citations omitted).

The trial court addressed the sufficiency of the evidence to support the termination under subsection(a)(2) as follows.

> These two [c]hildren became known to DHS in April 2014, when the Agency received a Report that Mother gave birth to S.A.A.S., and that both Mother and [c]hild tested positive for marijuana at the time of the birth. In May 2014, DHS referred the family to a FES provider to address the family needs, however the provider was unable to meet with the family. One [sic] June 8, 2014, DHS received another Report that the Children were involved in a car accident with Mother driving under the influence of an unknown substance. Neither, [sic] S.A.A.S., who was less than two months old, and [sic] S.A.P., who was three years-five [sic] months old, were [sic] appropriately secured in the seats of the car. Mother was arrested and the Children were taken to CHOP for examinations. Mother contacted S.A.A.S.'s [p]aternal [g]randmother, L.S., who picked up the Children from the hospital.
>
> S.A.A.S. was adjudicated [d]ependent on July 23, 2014, and S.A.P. was adjudicated [d]ependent on September 15, 2014, and both [c]hildren were placed in foster care. They were placed with Paternal Grandmother, L.S., where they remain to this day.

\* \* \*

[The trial court] relied on the lengthy and credible testimony by the CUA Case Manager, Ms. Abney, who testified that Mother was aware of the parental objectives established for her for reunification with her Children, and that she failed to achieve these objectives.

[Ms. Abney] testified the case plan objectives for Mother were for her to comply with drug and alcohol treatment, to complete parenting classes and to comply with BHS assessments and screening.

Regarding drug and alcohol treatment, Mother testified she complied with that objective, however, [she] did not provide documentation in that regard. On the contrary, Ms. Abney testified she received a [GPASS] Report dated July 6, 2015, noting that Mother was unsuccessfully discharged from their program. Ms. Abney stated Mother did complete three random drug screens, one of which was positive, and Mother refused a drug screen on another occasion.

Ms. Abney did corroborate that Mother did complete the parenting classes and received a certificate of completion in April 2016.

Regarding visitation with the Children, evidence was presented that Mother was minimally compliant with the permanency plan at the Permanency Review hearing on August 24, 2016. She had been referred back to CEU for assessment and did not comply. The [c]ourt then changed her visits to supervised at the Agency, and Mother again failed to comply. Instead, she blamed the Agency for it being too far away and for not accommodating her request for weekend or after school visits. Mother testified she relied on seeing the Children in the neighborhood when they would drive by in Paternal Grandmother's car.

Regarding housing, Mother stated she was homeless and in a shelter for 14 months, and has now obtained housing through Friends Rehabilitation.

Trial Court Opinion, 9/11/17, at 17-19.

After a careful review of the record, we find that termination of Mother's parental rights to the Children was warranted pursuant to subsection (a)(2), as Mother clearly lacks parental capacity, and the evidence showed that she will be unable to remedy that situation within a reasonable period of time, if ever. We find competent, clear and convincing evidence to support the termination of Mother's parental rights under subsection (a)(2). We, therefore, find no abuse of the trial court's discretion in terminating Mother's parental rights to the Children under subsection (a)(2).

Next, we address § 2511(b).

> **(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(b).

The focus in terminating parental rights under subsection (a) is on the parent, but it is on the child pursuant to subsection (b). ***See In re Adoption of C.L.G.***, 956 A.2d 999, 1008 (Pa. Super 2008) (*en banc*). In reviewing the evidence in support of termination under section 2511(b), our Supreme Court has stated as follows.

> [I]f the grounds for termination under subsection (a) are met, a court "shall give primary consideration to the

developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S. § 2511(b). The emotional needs and welfare of the child have been properly interpreted to include intangibles such as love, comfort, security, and stability. … [T]he determination of the child's "needs and welfare" requires consideration of the emotional bonds between the parent and child. The "utmost attention" should be paid to discerning the effect on the child of permanently severing the parental bond.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (some internal citations and quotation marks omitted; brackets added and deleted).

When evaluating a parental bond, "the court is not required to use expert testimony. Social workers and caseworkers can offer evaluations as well. Additionally, section 2511(b) does not require a formal bonding evaluation." *In re Z.P.,* 994 A.2d 1108, 1121 (Pa. Super. 2010) (internal citations omitted).

A parent's abuse and neglect are likewise a relevant part of this analysis:

[C]oncluding a child has a beneficial bond with a parent simply because the child harbors affection for the parent is not only dangerous, it is logically unsound. If a child's feelings were the dispositive factor in the bonding analysis, the analysis would be reduced to an exercise in semantics as it is the rare child who, after being subject to neglect and abuse, is able to sift through the emotional wreckage and completely disavow a parent . . . Nor are we of the opinion that the biological connection between [the parent] and the children is sufficient in of itself, or when considered in connection with a child's feeling toward a parent, to establish a *de facto* beneficial bond exists. The psychological aspect of parenthood is more important in terms of the development of the child and [his or her] mental and emotional health than the coincidence of biological or natural parenthood.

*In re K.K.R.-S.*, 958 A.2d 529, 535 (Pa. Super. 2008) (internal citations and quotation marks omitted).

- 21 -

The trial court stated the following with regard to subsection (b).

Mother asserts the trial court erred when it found that the termination of Mother's parental rights was in the Children's best interest, and that DHS had met its burden pursuant to 23 Pa.C.S.A. §2511(b).

The [c]ourt disagrees. Mother failed to present evidence to corroborate her assertions and her testimony was found to be not credible by this court. On the other hand, credible evidence was presented by the CUA Case Manager, who testified that the Children were bonded to Paternal Grandmother and look to her for safety and to meet their needs. They further testified that the Children needed the safety and security that Mother cannot provide, and it would be in their best interest to be adopted by Paternal Grandmother. The [c]ourt also found credible the evidence that the Children enjoyed seeing Mother on the street, however, did not seek her for their parental needs and were not bonded to her.

Therefore, this [c]ourt reasoned that the Children would not suffer irreparable harm if Mother's parental rights were terminated, and it would be in their best interests to be adopted.

Trial Court Opinion, 9/11/17, at 20-21.

We find clear and convincing evidence to support the termination of Mother's parental rights under subsection (b). We, therefore, find no abuse of the trial court's discretion in terminating Mother's parental rights to the Children under that subsection.

Finally, we address the change of the permanency goal for the Children to adoption.

[T]he standard of review in dependency cases requires an appellate court to accept findings of fact and credibility determinations of the trial court if they are supported by the record, but does not require the appellate court to accept the lower court's inferences or conclusions of law. We review for abuse of discretion[….]

*In re L.Z.*, 111 A.3d 1164, 1174 (Pa. 2015) (internal citation and quotation marks omitted; brackets added).

Regarding the disposition of a dependent child, § 6351(e), (f), (f.1), and (g) of the Juvenile Act provides the trial court with the criteria for its permanency plan for the subject child. Pursuant to those subsections of the Juvenile Act, the trial court is to determine the disposition that is best suited to the safety, protection and physical, mental and moral welfare of the child.

When considering a petition for goal change for a dependent child, the trial court considers

> the continuing necessity for and appropriateness of the placement; the extent of compliance with the service plan developed for the child; the extent of progress made towards alleviating the circumstances which necessitated the original placement; the appropriateness and feasibility of the current placement goal for the child; and, a likely date by which the goal for the child might be achieved.

*In re A.K.*, 936 A.2d 528, 533 (Pa. Super. 2007) (citing 42 Pa.C.S. § 6351(f)).

Additionally, Section 6351(f.1) requires the trial court to make a determination regarding the child's placement goal:

> **(f.1) Additional determination.—**Based upon the determinations made under subsection (f) and all relevant evidence presented at the hearing, the court shall determine one of the following:

> \* \* \*

> (2) If and when the child will be placed for adoption, and the county agency will file for termination of parental rights in cases where return to the child's parent, guardian or custodian is not best suited to the safety,

protection and physical, mental and moral welfare of the child.

42 Pa.C.S.A. § 6351(f.1).

On the issue of a placement goal change, this Court has stated:

When a child is adjudicated dependent, the child's proper placement turns on what is in the child's best interest, not on what the parent wants or which goals the parent has achieved. **See In re Sweeney**, 574 A.2d 690, 691 (Pa. Super. 1990) (noting that "[o]nce a child is adjudicated dependent . . . the issues of custody and continuation of foster care are determined by the child's best interests"). Moreover, although preserving the unity of the family is a purpose of [the Juvenile Act], another purpose is to "provide for the care, protection, safety, and wholesome mental and physical development of children coming within the provisions of this chapter."42 Pa.C.S. § 6301(b)(1.1). Indeed, "[t]he relationship of parent and child is a status and not a property right, and one in which the state has an interest to protect the best interest of the child." **In re E.F.V.**, 461 A.2d 1263, 1267 (Pa. Super. 1983) (citation omitted).

**In re K.C.**, 903 A.2d 12, 14-15 (Pa. Super. 2006).

The trial court stated as follows.

This [c]ourt heard credible and compelling evidence that Mother did not have a parental bond with the Children. She made no effort to complete her FSP objectives, and she made no effort to see her [c]hildren, instead relying on seeing them casually at birthdays or on the street when Grandmother was driving by. Therefore, this [c]ourt reasoned that the evidence was clear and convincing and supported the [c]ourt's finding that adoption by [P]aternal [G]randmother was in the Children's best interests.

**CONCLUSION:**

At the conclusion of the hearing[,] the [c]ourt stated:

Reviewing the evidence I just wanted to clear up that point. The [c]ourt order says Mother was present at the listing. That is critical because that is the day that Judge Gordon changed the visitation to supervised at the [A]gency from

- 24 -

unsupervised in the community. That's the last time you saw your [c]hildren at a visitation.

Well, the record is clear here and convincing, that the [m]other, while remaining on the peripheral of the Children's lives[,] never took any steps to develop, maintain a parental relationship, such that she would be able to begin parenting these [c]hildren. She allowed the custodial paternal grandmother, right?

S.A.A.S.'s paternal grandmother has been caring for these [c]hildren for two years, or more. And during that period of time Mother took no steps to put herself in a position to parent these Children, she allowed the grandmother to parent these Children. Was content with maintaining a peripheral relationship, kind of a friendly relationship with the Children, but at no times did she begin to put herself in a position where she could parent these Children.

She has not completed, satisfied, fulfilled any of her goals which were in essence to place herself in a positon where the Children could be returned to her, and she could be again parenting these Children.

The Children were removed from her custody and placed - with a very unfortunate incident which resulted in Mother's criminal conviction, which is part of the record for endangering these [c]hildren.

Since the Children were removed and placed, Mother took no serious steps to remedy the conditions that brought the Children into care, contending herself to remain as she, in her own word says, 'seeing the Children in passing,' which is what she is doing essentially. And she's forfeited any of her obligations for these Children as a parent should.

Consider the evidence, under 2511(a) (1), (2), (5) and (8), (5) [sic] satisfied because the Children were removed from Mother's care when she was placed; and (8) satisfied because the Children have been in care for over one year.

2511(b) requires there's a showing there would be no irreparable harm to the Children if Mother's rights were terminated. The evidentiary harm is satisfied because the

Children do not look to Mother for their parental guidance, for care, safety, any other emotional requirements that a parent should provide for the Children. They look to the grandmother for all these things, so, there could be no irreparable harm because there is no parental relationship.

The Mother having a knowledge that she's failed to have regular visitation with these Children since August of 2016, the Children have been in the care of the grandmother for two years, she's providing all of the things that a parent should provide. And the Children are doing well. And so[,] based upon the evidence, will continue to provide all of the things for these [c]hildren.

Therefore, under 2511(a) (1), (2), (5), and (8) and 2511 (b), Mother's rights are terminated, as to both [c]hildren, and the goal is moved to adoption since the [c]ourt has previously terminated Fathers' rights. (N.T., 5/11/2017, p.45 at 19-25; p.46 at 1-25; p.47 at 1-25; p.48 at 1-21)

For the foregoing reasons, this [c]ourt respectfully requests that the Orders of May 11, 2017, Terminating Mother, C.A.M.'s Parental Rights to her two Children and changing their Permanency Goals to Adoption be AFFIRMED.

Trial Court Opinion, 9/11/17, at 22-23 (emphasis in original).

Based on the foregoing discussion in the trial court opinion, we find no abuse of the trial court's discretion in changing the permanency goal to adoption.

Moreover, as we cannot find any other meritorious issues in the record, and we agree with Mother's Counsel that the appeal is wholly frivolous, we grant the motion for leave to withdraw.

Orders affirmed. Petition for leave to withdraw granted.

President Judge Emeritus Bender joins the memorandum.

President Judge Emeritus Stevens concurs in the result.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 4/4/18